**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **MO:20-CR-269-DC** |
| | § | |
| **SONNY RAY NABARETTE** | § | |

## ORDER DENYING MOTION TO SUPPRESS

BEFORE THE COURT is the Motion to Suppress filed by Defendant Sonny Ray Nabarette (Defendant). (Doc. 30). Also before the Court is the Government's Response in opposition to the Motion to Suppress. (Doc. 34). After due consideration of the parties' arguments, the evidence in the record, and the applicable law, the Court **DENIES** the Motion to Suppress. (Doc. 30).

## I. BACKGROUND

On September 23, 2020, a federal grand jury returned an indictment charging Defendant with unlawfully possessing a firearm despite knowing he was a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 19). Defendant filed the instant Motion to Suppress on November 20, 2020. (Doc. 30). The Government filed a Response in opposition to the Motion to Suppress on November 30, 2020. (Doc. 34). The Court held a hearing on the Motion to Suppress on December 8, 2020. A transcript of the hearing was filed on January 11, 2021. (Doc. 41).

## II. FACTS

At the suppression hearing, the Government presented the testimony of Officers Greg Palacios, Nate Garcia, and Nick Moore. At the time of the event at issue in this case, all of the witnesses were officers of the Odessa Police Department (OPD). Video recordings from Officer

Palacios's body camera, Officer Palacios's dash camera, Officer Garcia's body camera, and Officer Moore's interview of Defendant were also introduced into evidence.

Officer Palacios testified that at approximately 2:50 p.m. on September 5, 2020, he was driving to work when he heard a call from dispatch. (Doc. 41 at 6). Dispatch reported that there was a subject with a gun at the Delux Inn on Grant Avenue in Odessa, Texas, which was near Officer Palacios's location. Dispatch provided the description of a man wearing a white shirt and a hat, but Officer Palacios was not closely monitoring the radio and was unaware of the description until later. Based on his experience responding to calls in the area, Officer Palacios was aware there was a Stripes gas station located near the Delux Inn and thought it was possible the call could be related to the Stripes. As Officer Palacios drove past the Stripes and approached the Delux Inn, he observed individuals by the dumpsters in the area between the Delux Inn and the Stripes convenience store. When he drove by the Delux Inn, he observed there was construction, noted the parking lot seemed empty, and saw another patrol unit stop before turning into the Delux Inn parking lot. Officer Palacios made a U-turn on Grant Avenue and turned into the Stripes parking lot.

Palacios's dash camera video shows a silver-colored vehicle moving at the rear of the Stripes parking lot. The car turned into the alleyway behind the Stripes convenience store. Officer Palacios called over the radio, "Grab that car going through the alley." The dash camera video also shows that two men wearing white shirts were standing in the area between the dumpsters and the side of the Stripes convenience store.

Officer Palacios parked his vehicle and exited with his gun drawn. As he exited, he radioed another request that the car going through the alley be stopped. Officer Palacios approached the men in white shirts standing to the side of the Stripes. Several other officers also

approached with drawn weapons. One of the men wearing a white shirt said, "He loaded up over there," as he gestured toward the alley behind the Stripes.[1] Officer Palacios commented to another officer about the vehicle that went through the alley and quickly returned to his patrol unit. He testified that he thought there were enough officers at the scene and decided to "make a stop on that vehicle since it fled the scene." (Doc. 41 at 11).

As Officer Palacios made a U-turn in the Stripes parking lot, a silver-colored hatchback was turning left on Grant Avenue from the side street on the far side of the Stripes. The vehicle merged into traffic on Grant Avenue, and Officer Palacios followed in pursuit with his siren and emergency lights engaged. The silver hatchback pulled to the right side of the road and stopped. Officer Palacios stopped his patrol unit behind the vehicle, called out the license plate number to dispatch, and exited his unit.

Officer Palacios stood behind his open door and pointed his firearm at the silver hatchback. Another police vehicle approached, and an officer yelled to Officer Palacios, "That's not him. Those guys with the white shirt[s]." Officer Palacios responded, "As soon as we pull up, this guy takes off." The driver of the silver hatchback, later identified as Defendant, extended his arms through the open window of his vehicle. Officer Palacios directed him to step out of his vehicle and walk toward the patrol unit with his hands up. Defendant, who was bare headed and wearing a dark grey shirt, exited his vehicle and raised his hands in the air. He began walking backward toward Officer Palacios, as instructed.

Officer Palacios asked him why he "took off" as soon as the officers arrived. Defendant responded that he was trying to get out of the officers' way. Officer Palacios directed Defendant to walk backward toward him. Defendant complied, and Officer Palacios asked if he had any weapons on him. Defendant informed him that he had a knife in each back pocket. Officer

---

1. The statement, recorded by Officer Palacios's body camera, is somewhat muffled.

Palacios removed the knives from Defendant's pockets, frisked Defendant's waistband, and informed him he was not under arrest. Officer Palacios, who had holstered his firearm, directed Defendant to move toward the rear of the police vehicle and asked Defendant if he had seen anyone with a gun "over there." Defendant said that he had not and denied having a gun. Officer Palacios explained he stopped Defendant for "taking off" as soon as the police arrived. Defendant apologized, mentioned he saw some men coming through the back of the Stripes as the officers were arriving, and explained he thought maybe there had been an incident of theft. Officer Palacios requested permission to search Defendant's vehicle and Defendant gave him permission.

Officer Palacios approached the vehicle and asked the female passenger to step out of the vehicle. The female passenger reported that Defendant had come to the gas station to pick her up and they left because she became scared. Officer Palacios directed the female passenger to stand in front of his patrol unit and asked the other officers to obtain identification from Defendant and his female companion.

Officer Palacios then began searching the vehicle. He discovered a pistol and several magazines on the rear left floorboard beneath a toolbox and a number of other items. When Officer Palacios commented, "I thought you said there wasn't a gun in here." Defendant responded, "There's not supposed to be. There's nothing. Oh s---, that's my brother's .22."  The firearm forms the basis of the charge at issue in this case.

Through their subsequent investigation, OPD officers learned that Defendant's female companion had drug paraphernalia on her person and had asked Defendant to leave the Stripes when the police arrived because she was frightened of encountering the police.

### III. LEGAL STANDARD

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. The Supreme Court has determined warrantless searches and seizures are per se unreasonable unless an exception to the warrant requirement is applicable. *See Katz v. United States*, 389 U.S. 347, 357 (1967).

Evidence that law enforcement officers obtain in violation of the Fourth Amendment is subject to suppression under the exclusionary rule. *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061 (2016) (internal quotation marks omitted) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

Ordinarily, the defendant bears the burden of proving by a preponderance of the evidence that the evidence at issue was obtained in violation of the Fourth Amendment. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). However, when law enforcement officers conduct a search or seizure without a warrant, the government bears the burden of proving by a preponderance of the evidence that the search or seizure was constitutional. *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).

### IV. DISCUSSION

Defendant argues he was seized for Fourth Amendment purposes, and contends the officers lacked reasonable suspicion to stop him. Consequently, he asserts, his consent was the product of an illegal seizure and the fruits of the search of his vehicle should be suppressed. (*See*

*generally* Doc. 30). The Government asserts the officers had reasonable suspicion to stop Defendant and that there were no Fourth Amendment violations. (*See generally* Doc. 34).

### A. Seizure of Defendant

An individual is seized when a law enforcement officer by means of physical force or a show of authority restrains the individual's liberty. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). If a reasonable person in the individual's situation would not feel free to decline an officer's request or terminate the encounter with the police, that individual is seized within the meaning of the Fourth Amendment. *See United States v. Wise*, 877 F.3d 209, 219 (5th Cir. 2017) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). The record establishes that Defendant was seized when Officer Palacios initiated a stop of Defendant's vehicle.

The record further establishes that the encounter began as an investigatory detention. The Supreme Court "has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004). Reasonable suspicion requires that "the police officer [] be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999). Under *Terry*, "a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004).

Defendant argues that the police did not have reasonable suspicion to believe that he was the individual who was the subject of the 911 call. (Doc. 30 at 5–6). Specifically, Defendant contends that the anonymous 911 caller's reliability or credibility cannot be established. *Id.* at 5. He also argues that the information in the tip was not sufficiently specific with respect to the gun's color, or the suspect's weight, age, and future movements. *Id.* at 6. He asserts the officers did not verify the illegal activity reported in the tip. *Id.* He finally contends that even if the officer's had reasonable suspicion that Defendant was the man described by the 911 caller, this suspicion was dispelled when the officers realized his attire did not match the suspect's description. *Id.*

The Government contends that the officers did not need to have reasonable suspicion that Defendant was the man described in the 911 call but merely reasonable suspicion that Defendant may have engaged in criminal activity. (Doc. 34 at 5). The Government points to the Supreme Court's decision in *Wardlow*, which held that unprovoked flight from the police in a high crime area was sufficient to justify an investigatory stop. *Id.* at 5–6 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124–25).

In *Wardlow*, the Supreme Court concluded that the defendant's presence in a high crime area and "unprovoked flight upon noticing the police" was sufficient to constitute reasonable suspicion under *Terry*. 528 U.S. at 124. The Court reasoned that evasiveness was a factor to be considered in the reasonable suspicion analysis. *Id.* "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* The Court acknowledged its earlier decisions holding individuals may ignore the police and carry on about their business when the police lack reasonable suspicion or

probable cause to stop them. *Id.* at 125. However, "[f]light by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.*

In applying *Wardlow*, the Fifth Circuit has determined that flight need not be headlong to support a finding of reasonable suspicion. *See United States v. McKinney*, 980 F.3d 485, 495 ("We recently allowed lesser speed to create suspicion where 'flight' was a quick walk away from police."); *United States v. Darrell*, 945 F.3d 929, 935 (5th Cir. 2019) (affirming denial of a suppression where the defendant walked away from the police and increased his pace after initially being directed to halt, but did not run); *United States v. Tuggle*, 284 F. App'x 218, 225 (5th Cir. 2008) (concluding defendant fled when he walked away "briskly" after parting ways with a vehicle that "sped off"). However, the Fifth Circuit has also determined that merely walking past officers is insufficient to constitute flight. *United States v. Monsivais*, 848 F.3d 353, 361 (5th Cir. 2017); *see also United States v. Hill*, 752 F.3d 1029, 1037–38 (5th Cir. 2014) (noting a few quick strides between a car and an apartment building by a passenger was insufficient to provide reasonable suspicion to seize the driver of the car). Moreover, "[t]he context in which a person seeks to avoid contact with a peace officer is important." *Monsivais*, 848 F.3d at 360. "Reasonable suspicion may arise when an individual flees from police in a high-crime area, when officers are already patrolling the area in response to a specific report of criminal activity, or when the police have received a tip that the fleeing individual has committed a crime." *Id.* at 360–61 (internal citations omitted).

OPD officers responded to the Stripes convenience store due to a report of a man, who was wearing a white shirt and a hat, carrying a gun and behaving dangerously. While responding to the call from dispatch, Officer Palacios observed the silver hatchback driving through the rear of the Stripes parking lot and turning into the alley behind the Stripes. As he approached the two

8

men in white shirts, one told him, "He loaded up over there," and gestured toward the alley behind the Stripes.[2]

Under the circumstances of this case, the Court concludes Officer Palacios had reasonable suspicion to stop Defendant's vehicle. The Fifth Circuit has repeatedly noted that the context of the perceived flight is important, particularly whether there was crime in the area or a specific report of criminal activity. *See Darrell*, 945 F.3d at 938; *Monsivais*, 848 F.3d at 360–61; *see also Hill*, 752 F.3d at 1036 (noting "in deciding whether apparently evasive behavior in conjunction with the other relevant circumstances establishes reasonable suspicion, context is key"). Officer Palacios testified he has responded to a number of calls in the vicinity of the Stripes and Delux Inn and "those two joined areas are usually called in together." (Doc. 41 at 6). Moreover, the police were in the area responding to a specific report of suspicious behavior by an individual with a gun. As the police units entered the Stripes parking lot with lights and sirens engaged, Defendant turned his vehicle into the alley behind the Stripes and drove away. One of the men on the scene also made a comment and gestured to the alley in a manner that indicated the occupants of the silver car could be persons of interest to the police. This context is distinguishable from the scenarios in *Monsivais* and *Hill* where the police were not investigating specific activity and the Fifth Circuit concluded police lacked reasonable suspicion. *See Monsivais*, 848 F.3d at 356 (considering the stop of a defendant walking away from a disabled truck on the interstate who appeared nervous after police stopped to offer him assistance); *Hill*, 752 F.3d at 1035–37 (noting the testimony regarding crime rates was in reference to an entire

---

2. At the hearing, the Government argued the Court should consider Defendant's statements acknowledging he left the Stripes at his companion's request to avoid an encounter with the police. However, this information is irrelevant to the reasonable suspicion analysis because it was obtained by OPD officers after the stop. "A determination of whether an officer has reasonable suspicion to conduct a stop is 'answered from the facts known to the officer at the time.'" *United States v. Norbert*, 990 F.3d 968, 978 (5th Cir. 2021) (quoting *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008)).

county, not the specific area of the stop, and the officers were not investigating criminal activity at the apartment complex in question).

Officer Palacios described the silver vehicle as moving "quickly" and as "fleeing," but the dash camera video establishes that the vehicle was not travelling at a particularly high rate of speed when it moved through the Stripes parking lot and alley or when it turned left onto Grant Avenue. However, the Fifth Circuit has indicated that a high rate of speed is not necessary for an individual's behavior to be considered flight. *See McKinney*, 980 F.3d at 495 (discussing the *Darrell* decision). Therefore, the Court concludes that the fact Defendant drove his vehicle at an ordinary rate of speed does not preclude a finding of flight.

Moreover, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Due to the law enforcement officers' use of lights and sirens, it is reasonable to conclude Defendant was aware of the police officers' presence. Further, the timing of his departure from the Stripes—when police units began entering the Stripes parking lot—reasonably suggests a desire to evade an encounter with the police. Finally, the statement and gesture of one of the men at the Stripes could reasonably be interpreted as an indication Defendant was involved in suspicious activity. These articulable facts and rational inferences support reasonable suspicion to believe Defendant may have been involved in criminal activity, even if he was not the subject of the dispatch report and 911 call.

At the hearing, Defendant argued that leaving the Stripes as the officers approached could be entirely consistent with the behavior of an innocent person. Undoubtedly, that is correct; in *Wardlow*, the Supreme Court explicitly acknowledged that there can be innocent reasons for flight but noted "*Terry* accepts the risk that officers may stop innocent people." 528 U.S. at 126.

Indeed, all that *Terry* requires is reasonable suspicion, based on specific and articulable facts and the rational inferences drawn from them, that criminal activity *may* be afoot. *See* 392 U.S. at 21, 30. And "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (5th Cir. 2014) (internal quotation marks omitted) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

After considering the totality of the circumstances, the Court rules Officer Palacios had reasonable suspicion to stop Defendant and the seizure was appropriate under the Fourth Amendment.

## B.  Search of the Vehicle

Defendant contends that the search of his vehicle is the product of an illegal seizure and the evidence derived from it should be suppressed as the fruit of a poisonous tree. (Doc. 30 at 7). He does not challenge the voluntariness of his consent. *Id.*

The Court has concluded there was no underlying constitutional violation with respect to Defendant's seizure. Moreover, consent is an exception to both the warrant and probable cause requirements of the Fourth Amendment. *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002). As Defendant has not challenged the voluntariness of his consent, the Court concludes the search of the vehicle was permissible under the Fourth Amendment. Accordingly, evidence of the firearm found in the vehicle is not subject to suppression.

11

## V. CONCLUSION

Based on the foregoing discussion, the Court **DENIES** Defendant's Motion to Suppress.

(Doc. 30).

It is so **ORDERED**.

SIGNED this 22nd day of April, 2021.

_____
DAVID COUNTS
UNITED STATES DISTRICT JUDGE